[Civ. No. 6912.   Fourth Dist.   Jan. 31, 1962.]

BILL A. MARTIN, Petitioner, v. THE SUPERIOR COURT OF SAN DIEGO COUNTY et al., Respondents.

732

Holliday, Folsom & Winters for Petitioner.

Holt, Macomber, Graham & Baugh for Respondents.

SHEPARD, J.—This is a proceeding in certiorari to review a judgment finding petitioner, Bill Martin (hereinafter called Bill), in contempt for wilful refusal to obey an order requiring him to make certain payments for support of his former wife and his children.

## FACTS

In general substance the facts shown by the record before us are as follows: On September 8, 1959, Judge James C. Toothaker heard an uncontested action for divorce and ordered a decree of divorce in favor of plaintiff therein, Lillie Martin (hereinafter called Lillie) against Bill Martin. At said hearing Lillie was present in person with counsel. Bill was represented by counsel. His counsel in open court waived findings. Through error, the final judgment conforming to the order for judgment which had been made by Judge Toothaker was presented to and signed by Judge Bonsall Noon of the same court on September 18, 1959. The judgment was ordered entered *nunc pro tunc* as of September 8, 1959. By said judgment the custody of the two minor children of the parties was awarded to Lillie, and Bill was ordered to pay to Lillie for her support $150 per month and for the support of each of the two minor children the sum of $125 per month. Full jurisdiction was expressly retained by the court in the judgment to modify said support order.

On September 8, 1960, Bill personally signed his written declaration and application for a final decree of divorce. He therein represented to the court under penalty of perjury that the interlocutory decree of divorce had been rendered September 8, 1959; that he had fully complied with all the terms thereof, that the parties had not become reconciled, and that the judgment had become final. Pursuant to his petition, the final judgment of divorce was entered. He then married another woman. He regularly made all the payments to Lillie as required by the decree, until August 8, 1961. On that date and thereafter he failed to pay anything. On September 11,

1961, Lillie filed her declaration, upon which an order was issued and served upon him to show cause why he should not be punished for contempt for failure to comply with the order of September 8, 1959. This order was heard October 24, 1961. At that hearing he was absolved of contempt on the ground that there was not a sufficient showing that on August 8, 1961, and September 8, 1961, he had sufficient notice of the contempt of the decree of September 8, 1959. The court's oral comments also indicated doubt as to Bill's then ability to pay.

The declaration for an order to show cause in contempt upon which the present proceeding was had was filed by Lillie on October 30, 1961. In said declaration of October 30, 1961, Lillie set forth the fact of the interlocutory judgment of divorce of September 8, 1959; the order of the court therein for the payments hereinabove referred to; that at all times in said declaration mentioned, Bill had actual knowledge of said court order and financial ability to comply with said court order; that he knowingly and wilfully refused to comply with said order and failed to make the payments due on August 8, September 8 and October 8, 1961, each in the amount of $400. On November 13, 1961, Bill filed his declaration in response thereto, in which his sole representation to the court was, "He has no earnings or income greater than he had on October 24, 1961, at which time this court dismissed a contempt and denied modification. . . ." The hearing on this order to show cause was held on December 1, 1961. There was received in evidence by stipulation the transcript of the hearing of October 24, 1961, at which Bill was present, and the affidavits and declara-. tions of Lillie signed September 11, 1961, October 2, 1961, October 16, 1961, and October 30, 1961. In addition, extensive oral testimony was received.

From the witness stand Bill unequivocally admitted that on October 8, 1961, he knew the contents of the decree of September 8, 1959. During the hearing Bill admitted the receipt by him of $2,900 in cash plus $150 per week during a considerable period of time from July to October; that he had purchased a new automobile for about $3,000; that after the entry of the interlocutory decree his second wife raised serious objections to his payment of support money to Lillie and the children; that his interest in two corporations of substantial value was transferred by him to his second wife.

At the conclusion of the hearing the court orally stated, "I find this is not an integrated property settlement agreement. I find that he did have the ability to comply with this

October payment only, not talking about the August and September payments.'' The court also stated that he had knowledge of the decree and that he was in contempt; it sentenced him as punishment for the contempt to five days in jail and granted a stay of execution responsive to Bill's motion. After completion of the hearing, still on December 1, 1961, the court signed its order and commitment for contempt wherein it was recited, *inter alia,*

''The matter having been heard, and from the evidence introduced herein the Court finds: That BILL A. MARTIN has had and does have full and complete knowledge of the Orders of the Court heretofore made and in particular the Order dated September 18, 1959, NPT September 8, 1959, and has had and does have the ability to comply with the said Order or to refrain from doing that which is prohibited therein, and that this person has wilfully, knowingly and contemptuously failed and refused to obey and comply with the said Order of the Court, and therefore

''IT IS HEREBY ADJUDGED THAT BILL A. MARTIN IS GUILTY OF CONTEMPT OF COURT.''

## IMPRISONMENT FOR DEBT

■■ Bill first contends that because the orders for payment and support as contained in the decree were resultant from the property settlement, any order for contempt would be imprisonment for debt, citing *Plumer* v. *Plumer,* 48 Cal.2d 820 [313 P.2d 549] ; *Plumer* v. *Superior Court,* 50 Cal.2d 631 [328 P.2d 193], and *Hough* v. *Superior Court,* 179 Cal.App.2d 342 [3 Cal.Rptr. 778]. There is no merit in this contention. In the hearing of the divorce case the property settlement was not presented to the court. The attorney for petitioner was present and participated in the hearing. While certain provisions of the property settlement agreement were orally related to the court, no effort was made to secure the approval by the court of the agreement itself and it is not mentioned in the decree. The decree merely ordered the support payments unconditionally and expressly reserved the right to modify such order at any time. Furthermore, in the property settlement agreement it was specifically provided that, ''The parties agree further that this support shall be a statutory obligation and not a contractual one, and that the court shall reserve jurisdiction to alter, modify or terminate said payments.'' It further provided that the sums agreed upon for support are reasonable. No limitation whatever was attempted to be placed on the power of the court to alter, modify or terminate the

support payments. As was said in *Plumer* v. *Superior Court, supra,* p. 635 [3],

"Payments which fall into the category of law-imposed alimony or separate maintenance are based upon the statutory obligation of marital support, may be modified by the court upon a proper showing, ordinarily terminate with the death of either party, and may properly be held not to constitute a 'debt' within the meaning of the constitutional provision."

We are satisfied that the trial court was correct in treating the order for support as one based on a statutory obligation and separable from the provisions for property settlement.

## DECREE VALIDITY ESTOPPEL

Bill next contends that the decree of September 8, 1959, was void because it was signed by Judge Bonsall Noon, who had not heard the evidence, instead of Judge James C. Toothaker, who did hear the evidence, citing *Williams* v. *Superior Court,* 14 Cal.2d 656 [96 P.2d 334]. Respondent counters with the contention that petitioner by his own acts is estopped to deny the validity of the decree. The two contentions will be discussed together.

It is true that when a matter has been assigned to and is being heard by the judge of one department of the superior court the judge of another department ordinarily has no jurisdiction to interfere with the matter so being heard. (*Williams* v. *Superior Court, supra,* p. 663 [4]; *Thomasian* v. *Superior Court,* 122 Cal.App.2d 322, 332 [11] [265 P.2d 165]; *Steinberg* v. *Goldstein,* 129 Cal.App.2d 682, 687 [5b] [278 P.2d 22]; *Regents* v. *Superior Court,* 185 Cal.App.2d 806, 809 [1b-2b] [8 Cal.Rptr. 629]; *Reimer* v. *Firpo,* 94 Cal. App.2d 798, 801 [4] [212 P.2d 23].) But in those cases no elements of estoppel were discussed.

On the other hand, the well recognized rules of estoppel may in proper case preclude a party from denying a fact where his own previous action has led another to so conduct himself that the other would suffer harm if the truth were known. (*Davenport* v. *Stratton,* 24 Cal.2d 232, 243 [6] [149 P.2d 4].) This broad rule has been stated and applied in varying ways. Its essential elements have been applied to divorce decrees where the court granting the decree might well have been held to lack jurisdiction if estoppel did not intervene. As was said in *Rediker* v. *Rediker,* 35 Cal.2d 796, 805 [7] [221 P.2d 1, 20 A.L.R.2d 1152]:

"The validity of a divorce decree cannot be contested by a

party who has procured the decree or a party who has remarried in reliance thereon, or by one who has aided another to procure the decree so that the latter will be free to remarry.''

(See also *Spellens* v. *Spellens*, 49 Cal.2d 210, 219 [2] [317 P.2d 613] and authorities therein cited; *Smith* v. *Smith*, 157 Cal.App.2d 46, 48 [2] [320 P.2d·100]; *Watson* v. *Watson*, 39 Cal.2d 305, 307 [3] [246 P.2d 19]; *Falconer* v. *Falconer*, 95 Cal.App.2d 4, 5 [1] [212 P.2d 5].)

Thus, the problem is not whether the decree was faulty or void but whether or not the actions of the party sought to be estopped prevent such party from challenging the decree. No cases involving the precise situation here present have been called to the attention of this court, and our research has revealed none. However, we are satisfied that the principles do apply. ■■■ Here Bill, through his counsel, participated in the original proceedings. He himself personally, under penalty of perjury, represented to the judge who signed the decree, that the interlocutory decree had been lawfully entered and that he had complied with all the provisions thereof. He could not truthfully make such representation without personal knowledge of the contents of the decree. The record before us shows that he participated in the division of property of the parties as ordered by the interlocutory decree and received as his separate property valuable corporate interests and other valuable property free from any further claim by his former spouse; that Lillie surrendered her interest therein; that he transferred much of this property to his second wife; that he regularly paid the amounts provided by the decree until August 8, 1961, and that he remarried. Thus, both he and Lillie materially altered their lives and property in full reliance on the validity of the decree, in the procurance of which he participated, and pursuant to which, on his own sworn affidavit he alone secured the final decree. We hold that the rules of estoppel as set forth in the authorities above cited foreclose him from challenging the validity of the decree.

## Double Jeopardy

■■■ The affidavit charged a contempt as of August 8, 1961, and another contempt as of September 8, 1961. These two alleged contempts had been tried on October 24, 1961, and the court dismissed the contempt proceeding. At the hearing of December 1, 1961, the court held that Bill could not be recharged with the alleged contempts of August 8, 1961, and September 8, 1961, because he had already been in jeopardy upon those charges. The attorney for the respondent appar-

ently misunderstood the court's ruling in this respect, as is shown by extensive argument recorded in the transcript. The trial court's ruling was correct. This ruling, however, does not mean that Bill could not be charged with contempt for failure at some subsequent time to make these payments if it could then be shown that he, at such subsequent time, had the financial ability to pay them and had refused to do so. Failure to comply with the court's order to pay when one has the ability to pay is a continuing offense. That is to say, if it could be shown that at some later time he had such ability and then wilfully refused to pay he could again be charged with contempt as of such later date, but he could not be recharged respecting a date which had already been tried. (*In re Toor*, 131 Cal.App.2d 75-76 [1-2] [280 P.2d 79]; *In re Earl*, 132 Cal.App. 445, 447 [3] [22 P.2d 773].)

CONTEMPT ORDER

The contempt order signed December 1, 1961, ordered Bill to report to jail at 5 p. m. on December 5, 1961, to serve his sentence. Stay of execution was granted to permit Bill to petition this court for a writ of certiorari. On December 5, 1961, a petition for such writ was filed with this court. The order for commitment was thereafter three times modified, extending the time for Bill to report to the county jail. On December 13, 1961, the trial court signed and filed its amended order and commitment for contempt, reciting in detail the order for payments contained in the decree of September 8, 1959, the failure to make the payments of August 8, September 8 and October 8, 1961; that the alleged contempts of August 8 and September 8 were dismissed; that at all times in said decree mentioned defendant has had and does have full and complete knowledge of the contents of the order of September 8, 1959. That defendant has the ability to make the payment of October 8, 1961; that defendant has wilfully, knowingly and contemptuously failed and refused to comply with said order for payment on October 8, 1961; that defendant had the ability to pay the plaintiff $400 as of October 8, 1961. Then follows the recital of the purchase of the new automobile and the various amounts received from the first of July to November 1961.

It will be noted that the declaration upon which the order of December 1, 1961, was based sufficiently set forth the facts of knowledge, ability to pay and refusal to pay, all as of October 8, 1961. There is no contention that this affidavit was insufficient. Bill's declaration and response thereto did not

constitute a denial of any part of it. The oral evidence was sharply conflicting on Bill's ability to make the payment as of October 8, 1961.

It will be noted that the order fails to recite findings that Bill had knowledge of the contents of the decree on or before October 8, 1961, and also fails to recite that Bill had the financial ability on October 8, 1961, to make the payment required on that date. While there was sufficient evidence to support a finding by the court of ability to pay on October 8, 1961, the fact of such ability was in sharp dispute. ▮ As was said in *Freeman* v. *Superior Court,* 44 Cal.2d 533, 536 [2, 3] [282 P.2d 857] :

"A contempt proceeding is not a civil action but is of a criminal nature even though its purpose is to impose punishment for violation of an order made in a civil action. [Citation.] ▮ Accordingly, no presumption of validity may be indulged in support of judgments in contempt, as would be the case with respect to ordinary judgments." (See also *Raiden* v. *Superior Court,* 34 Cal.2d 83, 86 [3] [206 P.2d 1081] ; *Reymert* v. *Smith,* 5 Cal.App. 380, 382 [90 P. 470] ; *In re Lake,* 65 Cal.App. 420, 425, 426 [3] [224 P. 126] ; *In re Felthoven,* 75 Cal.App.2d 465, 470 [4] [171 P.2d 47] ; *Stonaker* v. *Superior Court,* 117 Cal.App.2d 292, 302 [2, 3] [255 P.2d 857].)

Due to the fact that contempt proceedings are thus regarded and set apart from all other special proceedings, it has been constantly held that written findings reciting the truth of the jurisdictional prerequisites are necessary in any order adjudicating contempt. ▮ As was said in *Merritt* v. *Superior Court,* 93 Cal.App. 177, 179 [1] [269 P. 547], "It is undeniable that the order adjudging one guilty of contempt must on its face recite facts showing the contempt," and in *Nutter* v. *Superior Court,* 183 Cal.App.2d 72, 75 [3, 4] [6 Cal.Rptr. 404],

▮ "A mere recital that such party wilfully failed to pay or wilfully violated the judgment or order of the court is not equivalent of recital that it is within his power to comply with such judgment or order and hence is insufficient to show jurisdiction to imprison him for contempt. ▮ A judgment of contempt must not only specify the act to be performed, it must also include a finding that such act is within the power of the contemner to perform." (See also *In re Cowden,* 139 Cal. 244 [73 P. 156] ; *Bailey* v. *Superior Court,* 215 Cal. 548, 552 [2] [11 P.2d 865] ; *Groves* v. *Superior Court,*

62 Cal.App.2d 559, 569 [9] [145 P.2d 355]; *Harlan* v. *Superior Court*, 94 Cal.App.2d 902, 905 [6] [211 P.2d 942]; *In re Lande*, 96 Cal.App.2d 926, 930 [216 P.2d 909]; *In re McClausland*, 130 Cal.App.2d 708, 709 [1, 2] [279 P.2d 820]; *In re Michelena*, 150 Cal.App.2d 377, 378 [1, 2] [309 P.2d 861].)

The order of December 1, 1961, was fatally defective.

### AMENDMENT NUNC PRO TUNC

The next question is whether or not the amended commitment and order for contempt signed December 13, 1961, could validly correct the defective order of December 1, 1961. No authority has been cited by either party which would support a *nunc pro tunc* order adding to the findings in a contempt case so as to give life to an otherwise lifeless order. It will be noted that the order of December 13 was made subsequent to the time within which the sentence under the order of December 1 would have expired and after the petition had been filed in this court for a writ of certiorari. We do not here have a merely misplaced word or date; what we do have is an attempt actually to add to findings which were deficient, at a time after the prescribed period of punishment had expired and after the petition for writ of certiorari had been filed. The rule is frequently stated that a clerical error or misprision may always be corrected by the court but a judicial error may not be so corrected by *nunc pro tunc* order. ▉ Because of the fact that an order in contempt is a final and conclusive order not subject to appeal, any attempt to supply a new finding not contained in the order at a time after the time fixed for service of the sentence in the original order has expired, can be classified only as judicial error and may not be permitted. (*Blake* v. *Municipal Court*, 144 Cal. App.2d 131 [300 P.2d 755].) Nor do we think that the amended orders of December 5 and December 8, which attempted to extend the time for the period of service of sentence, can be used to vitiate this rule. If an order, which by statute is final and conclusive, can be amended and reamended to supply vital deficiencies therein, the feet of the litigant would be standing on quicksand, without any idea when he could take effective proceedings to annul the order.

The order adjudicating a contempt and imposing imprisonment is annulled.

Griffin, P. J., and Coughlin, J., concurred.